HARVEY *v.* SILBER.

1. EVIDENCE—OPINION OF A PHYSICIAN—LOCAL STANDARDS OF PRACTICE.

   While opinion evidence by a physician may not be given by one who has no knowledge or experience of the medical standards in the community, where a physician's study results in the formation of a definite opinion he may express it and the weight thereof will be a matter for the jury.

2. PHYSICIANS AND SURGEONS—MALPRACTICE—LOCAL STANDARDS OF PRACTICE—OPINION TESTIMONY.

   Testimony as to local practice in treatment of gunshot wounds by physician who was only a medical student at time gunshot wounds were inflicted upon plaintiff's deceased but who had graduated the following year, served as an intern in a local hospital for a year, and thereafter practiced in the locality was admissible in action for malpractice for such weight as the jury cared to give it where it is admitted that the local practice in such cases had not changed since the wounds involved were inflicted.

---

Degree of skill and standard of conduct required of surgeon, see 2 Restatement, Torts, § 299 and comment (d).

Functions of court and jury on issue of causation, see 2 Restatement, Torts, §§ 434, 432 and comment c.

3. SAME—MALPRACTICE—EXAMINATION. OF X-RAY PLATES.

The existence of relation of physician and patient even for the limited time and purpose of examining X-ray plates may form sufficient basis for an action for damages for malpractice.

4. WITNESSES—PHYSICIAN-PATIENT RELATION—STATUTES—WAIVER BY PERSONAL REPRESENTATIVE.

Statute prohibiting physician or surgeon from disclosing information acquired while attending patient in professional capacity is for the patient's, not the physician's, benefit, and may be waived by personal representative of patient in suit by his estate for malpractice (3 Comp. Laws 1929, § 14216).

5. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE—HOSPITAL RECORDS MADE IN USUAL COURSE OF BUSINESS.

Hospital records made in writing in the usual course of business are admissible in evidence in action for malpractice (3 Comp. Laws 1929, § 14207, as amended by Act No. 15, Pub. Acts 1935).

6. SAME—GUNSHOT WOUNDS—DIAGNOSIS—X-RAY PLATES—MANUAL EXAMINATION—NEGLIGENCE.

Refusal of a doctor to give due consideration to an X-ray of a patient who had suffered gunshot wounds and placing reliance upon a manual examination could be regarded as negligent diagnosis of such an injury upon which to base an action for malpractice.

7. SAME—DIAGNOSIS OF GUNSHOT WOUNDS—X-RAY PLATE MARKINGS.

Action of chief of X-ray department of hospital in changing marking on plate from designation of left side to right side notwithstanding his opinion that bullet in patient with gunshot wound was lodged in left side of abdomen constituted negligence on part of roentgenologist sufficient to charge him with malpractice where error in location of bullet could be found to have prevented further diagnosis by him and another doctor as to the course taken by the bullet.

8. SAME—DIAGNOSIS—OPERATION—PROXIMATE CAUSE—DEATH.

Negligent diagnosis as to course of bullet through abdomen of patient suffering with gunshot wounds which resulted in a failure to operate which would have probably saved patient's life *held*, a proximate cause of death.

9. Same — Malpractice — Instructions — Diagnosis — Proximate Cause.

Instruction in action for malpractice in diagnosis and treatment of patient suffering with gunshot wounds that if plaintiff proved by a preponderance of the evidence that negligence of defendant physicians deprived the patient of the probability that his life would have been saved by an operation, accompanied by instruction that if operation only "might possibly have saved the life" of the patient defendants could not be held for damages, *held*, substantially correct and charge, taken in its entirety, fairly to have informed jury on law applicable to issues raised by pleadings and evidence.

10. Damages—Malpractice—Diagnosis—Treatment of Gunshot Wounds.

Verdict of $10,000 as modified by remittitur of $4,000 in action against physicians for malpractice in diagnosis and treatment of plaintiff's deceased for gunshot wounds *held*, not so great as to shock the conscience of the court.

Appeal from Wayne; Nicol (Henry G.), J. Submitted October 14, 1941. (Docket No. 24, Calendar No. 41,708.) Decided February 11, 1942. Rehearing denied April 6, 1942.

Case by Sidney S. Harvey, administrator of the estate of Garfield Harvey, deceased, against Bernhard Friedlaender, Edward G. Minor, and City of Highland Park for malpractice. Discontinued as to City of Highland Park. Verdict and judgment for plaintiff. Remittitur filed by plaintiff. Edward G. Minor and Albert J. Silber and Emil D. Rothman, executors of the last will and testament of Bernhard Friedlaender, deceased, appeal. Affirmed.

*Walter M. Nelson, Harry Cohen,* and *John Sklar,* for plaintiff.

*Douglas, Barbour, Desenberg & Purdy,* for defendant Minor.

*Humphreys Springstun,* for defendants Silber and Rothman.

BUSHNELL, J.  Plaintiff's intestate, Garfield Harvey, was taken to the Highland Park general hospital shortly after midnight on Sunday, March 14, 1937, where it was found he had a gunshot wound on the right side of his back just above the hip. First aid was administered and the late Dr. Bernhard Friedlaender, one of the staff surgeons at the hospital, attended Harvey about 8 a.m.  It fairly appears from the record that Doctor Friedlaender thought he felt the bullet through the skin on the right side of Harvey's abdomen.

Three X-rays were taken.  Defendant, Dr. Edward G. Minor, chief of the X-ray department of the hospital, testified that he never saw the deceased, nor did he take the X-ray pictures himself.  He saw the wet X-ray plates sometime during Sunday morning, March 14th, just after they came out of the dark room.  It was his opinion at the time that these plates showed the presence of a bullet in the soft structure just below the skin surface and to the left of the median line, in the anterior portion of the left side of the abdomen.  The X-ray plates were received in evidence and show the letter "R" thereon, which had been scratched over the letter "L". Doctor Minor was asked:

"Q. . What was your purpose in changing that right to the left?

"A.  Due to the fact that Dr. Friedlaender disagreed on my diagnosis, and his clinical findings were such that I took his word that there might be some confusion in the markings."

When asked whether Doctor Friedlaender made a special request that the markings be changed, Doctor Minor replied:

"I do not know whether he said just exactly that they be changed but he insisted that the bullet was on the right side.  After all, I am just the X-ray

man and he is the physician. He has that patient. That conversation took place on the morning when the man was in the hospital.''

Doctor Minor was asked:

''*Q*. Did you make a careful examination of this plate prior to your conversation with Dr. Friedlaender?

''*A*. When it was brought from the dark room while wet I looked at it and said, 'There is the bullet in the lower left quadrant.' He was present. That is all there was. It did not last over two minutes. I did not look at that plate again that day. The next time I took a look at that plate was the next day. I knew there was a bullet there, and it was reported to the stenographer. That report was made on Monday.''

The report just referred to reads:

''Films were made of the abdomen. These show presence of a bullet in the soft structures right at the median line and approximately just below the skin surface. It occupies a position in the anterior portion of the lower right quadrant.''

There was also introduced in evidence a subsequent report signed by Doctor Minor, dated June 22, 1937, which reads:

''Further study of the films of March 14, 1937 was made of the abdomen in the two planes. These show presence of a bullet in the soft structures just below the skin surface and to the left of the median line. It apparently occupies a position in the anterior portion of the left side of the abdomen just below the skin surface.''

Harvey died at 6:35 p.m. on Sunday, March 14th. about 18 hours after the shooting. Dr. Paul A. Klebba, Wayne county medical examiner and physician to the coroner for the last 17 years, performed

the autopsy on the body of the deceased on March 15th, and made the following notes:

"That a bullet entered the body at the right back— right back, and that the bullet took a course from the back forward, from the right to the left, and that the bullet proper was found in the abdominal cavity in the upper left quadrant, and I made a note to refer to my chart on location and description of wounds, which show the approximate entrance of the bullet and the approximate point on the body where the bullet was found. And looking at the chart, it says that the approximate entrance was in the right back to the right of the lumbar spine, which is the small of the back, and in a position at the point of entrance about four inches to the right of the spinal column in the small of the back just a little above the belt line. The bullet went from the back forward and from the right side of the body to the left side of the body, and was found in the left abdominal cavity. That would be below the ribs on the left side, to the left of the medial line, forward medial line, below the left nipple about eight inches."

He testified:

"Taking the entrance, the point of entrance and the point of finding the bullet, it would have to make several perforations because you do not have one coil on top of the other, you have your coils of the bowel one on top of the other and in front and behind. I do not know how many perforations there were because I did not dissect the entire bowel to determine the number of perforations. I would consider from 6 to 20 or 30 perforations. It might go through both sides of the same section of the bowel. If he was a normal man and the bullet took the course I found from the point of entrance to the point where I found it, it would perforate only the intestines."

Doctor Klebba said he found blood in the abdomen sufficient to cause death, and that, in his opinion, the cause of death was an internal hemorrhage following a bullet wound through the abdomen. In answer to the question propounded by plaintiff's counsel as to the probability of checking and ultimately stopping hemorrhages by suturing the perforations in the intestines, he said such operation "would have a tendency to preserve life."

On cross-examination, he gave as his opinion that, under the usual and ordinary practice of a surgeon of average skill, a man who is in a state of shock should not be operated on until that condition has subsided.

Plaintiff produced as an expert, Dr. Maxim P. Melnik, who testified that:

"The usual and standard practice in this community or similar communities of ordinary surgeons and physicians is to have immediate surgical intervention, that is, operation, in order to check any bleeding or hemorrhage caused by the wound. * * * as I said, the operation is the only thing that stops the hemorrhage, and by stopping the hemorrhage one has a chance to save one's life. * * * The probability is that his life could have been saved by immediate operation when the patient was in fairly good condition, was fairly good."

At the time Harvey was shot, Doctor Melnik was a student in the medical department of Wayne university. He graduated in 1938, served one year as an intern at Providence Hospital, and has practiced ever since in Detroit. It is claimed the court erred in admitting the testimony of Doctor Melnik because he was only a medical student in 1937 when Harvey was shot. It is admitted that the local practice of treatment of gunshot wounds has not changed since 1937.

In *Perri* v. *Tassie*, 293 Mich. 464, the court held that opinion evidence may not be given by one who has no knowledge or experience of the medical standards in the community. See authorities therein cited.

However, the testimony of Doctor Melnik in the instant case was admissible under the authority of *People* v. *Thacker*, 108 Mich. 652, wherein the court quoted the views expressed by Mr. Justice CAMPBELL in *People* v. *Millard*, 53 Mich. 63. In the *Thacker Case*, Doctor Dean gave opinion testimony on arsenic poisoning although he had never treated a person who had been poisoned or had ever seen one treated by another physician. He had, however, studied medicine for four years and had spent one year in the hospital under the instructions of the hospital physician. The court held that, since his study had resulted in the formation of a definite opinion, he might express it and that the weight to be given his testimony was a matter for the jury.

The relation of physician and patient is not seriously disputed as to Doctor Friedlaender, but Doctor Minor claims the court erred in instructing the jury that such a relation existed between himself and·Harvey from the time he examined the X-ray plates until Harvey's death. Doctor Minor contends that this relation did not exist except for a limited time and only for the purpose of taking and examining the X-rays. Since this is sufficient time to sustain plaintiff's theory whether or not the relation existed from then on is immaterial and nonprejudicial.

Was it proper to admit the hospital records?

Appellants contend for a rather strained construction of the statute (3 Comp. Laws 1929, § 14216 [Stat. Ann. § 27.911]), which deals with the privilege between physician and patient. This court has fol-

lowed the rule that the statutory exclusion is for the patient's benefit and not the physician's. *Storrs* v. *Scougale,* 48 Mich. 387.

In the face of *Gile* v. *Hudnutt,* 279 Mich. 358, counsel cannot successfully argue that the hospital records are not admissible under the provisions of 3 Comp. Laws 1929, § 14207, as amended by Act No. 15, Pub. Acts 1935 (Comp. Laws Supp. 1940, § 14207, Stat. Ann. § 27.902), which makes entries in writing made in the usual course of business admissible in evidence. It is argued that the privilege respecting such records can be waived only by a living patient except in a will contest. It is true that the statute (3 Comp. Laws 1929, § 14216 [Stat. Ann. § 27.911]) contains a provision for waiving the privilege in a will contest by heirs at law who shall for this purpose be deemed personal representatives. But it does not follow that a personal representative may not waive the privilege under the circumstances of this case. Under a Wisconsin statute (Wisconsin Statutes 1933, § 325.21) authorizing waiver of the privilege by a "personal representative or other person authorized to sue for personal injury," the court held in *Estate of Gallun,* 215 Wis. 314 (254 N. W. 542), that the provision for waiver was not exclusive and the privilege could be waived by an executor or administrator under other circumstances, such as inheritance tax matter, citing among other authorities, *Fraser* v. *Jennison,* 42 Mich. 206. See, also, *Johnson* v. *Fidelity & Casualty Co. of New York,* 184 Mich. 406, 412 (L. R. A. 1916 A, 475), and 126 A. L. R. 380, for annotated cases on this subject. We think the reasoning of the Wisconsin case is applicable here.

From the autopsy and subsequent study of the X-ray plates it is clear that Doctor Friedlaender misapprehended the course which the bullet had

taken. If the bullet had in fact lodged on the right side, the wound would have been superficial. Whether or not Doctor Friedlaender would have operated had he known the true location of the bullet and whether or not an operation would have saved Harvey's life are disputed questions of fact.

Was the diagnosis as to the location of the bullet negligent?

As to Doctor Friedlaender's negligence, the jury could infer that he relied on his manual examination, in which he incorrectly thought that he felt the bullet on the right side, and that he paid little heed to the X-ray. Refusal to give the X-ray due consideration and reliance upon a manual examination could be regarded as negligent diagnosis of this serious injury. See *Rogers* v. *Kee,* 171 Mich. 551; *Rann* v. *Twitchell,* 82 Vt. 79 (71 Atl. 1045, 20 L. R. A. [N. S.] 1030), and *Fortner* v. *Koch,* 272 Mich. 273 (38 N. C. C. A. 334), and *Fortner* v. *Koch,* 277 Mich. 429.

As to Doctor Minor's negligence, he testified regarding his study of the X-ray plates that: "They were not carefully studied, no. * * * It was a casual examination of a wet plate. * * * I found it (the bullet) over on the left side when I looked over the films carefully." There was expert testimony that the bullet showed plainly and that an expert roentgenologist could tell which side of the body was the right or left without resort to any markings on the plate.

That Doctor Minor did not make a careful study of the X-ray plate is admitted in his own testimony. However, it is argued on behalf of Doctor Minor that since his study of the plate, though casual, disclosed the true location of the bullet, any negligence on his part in that respect could not be the proximate cause of the failure to operate.

The jury could infer that if Doctor Minor had studied the plates more carefully, he would not have so readily concluded that there had been some confusion in the marking of the plates and would not have had the "R" scratched over the "L". Doctor Minor's unconsidered acquiescence with Doctor Friedlaender as to the location of the bullet could be found to have prevented further diagnosis by Doctor Friedlaender and himself. Thus the negligence of both Doctor Friedlaender and Doctor Minor resulted in an inaccurate diagnosis of the course taken by the bullet. See *Rodgers* v. *Canfield*, 272 Mich. 562, 564.

Was the negligent diagnosis the proximate cause of Harvey's death?

Since the medical experts agreed that Harvey was almost certain to die unless an operation was performed, the jury could properly infer that Doctor Friedlaender would have operated if he had known the true position of the bullet. The negligent diagnosis then was the proximate cause of the failure to operate. There is testimony in the record that there was a probability that an operation would have saved Harvey's life. Therefore the negligent diagnosis could be said to have been the proximate cause of the death. See *Lippold* v. *Kidd*, 126 Ore. 160 (269 Pac. 210, 59 A. L. R. 875), and annotated cases, p. 884 *et seq.*, to the effect that proof of "probability" is sufficient.

The court charged the jury that:

"In this case the plaintiff does not complain that Garfield Harvey was shot, but he complains that Garfield Harvey having been shot, the defendants negligently failed to properly diagnose, care for and treat his injuries, and that that failure deprived Garfield Harvey of the probability that his life would have been saved had he received the careful diagnosis, care and treatment to which he was entitled at

the hands of the defendants; and if you find that one or both of the defendants were negligent as I have heretofore defined it, and that that negligence or want of due care deprived Garfield Harvey of the probability of life he would have had if the requisite degree of care had been exercised, then the failure to exercise that care would in this case be the proximate cause of his death, notwithstanding that he would have died and did die from the gunshot wound without intervention or the benefit of that degree of due care.''

Appellants assign error as to this portion of the charge, but in view of the foregoing it was substantially correct. The rights of the parties were fully protected by subsequent language of the charge that:

''I further charge you, members of the jury, that you may not return a verdict for the plaintiff if he has shown only that surgical intervention might possibly have saved the life of Garfield Harvey, but, on the other hand, it is not incumbent on the plaintiff to show that to a certainty surgical intervention would have saved his life. It is sufficient if the plaintiff by a preponderance of the evidence has satisfied you that surgical intervention would with reasonable probability have saved his life, that is, the life of Garfield Harvey. * * * If you find that the bullet wound inflicted upon Garfield Harvey by David Petty was the proximate cause of Garfield Harvey's death, you must return a verdict for the defendants.''

The charge taken in its entirety fairly informed the jury on the law applicable to the issues raised by the pleadings and the testimony.

The claimed negligence of defendants was submitted to a jury which returned a verdict of $10,000, on which the trial judge ordered a remittitur of $4,000.

The verdict as modified does not shock the conscience of the court.

The judgment is affirmed, with costs to appellee.

CHANDLER, C. J., and BOYLES, NORTH, STARR, and SHARPE, JJ., concurred with BUSHNELL, J. WIEST and BUTZEL, JJ., concurred in the result.