*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CO-35

DARRISE JEFFERS, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-18130-18)

(Hon. Craig Iscoe, Trial Judge)

(Argued April 5, 2019                                    Decided May 23, 2019)

*Veronice A. Holt* for appellant.

*Dan Honold*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *John Timmer*, and *Melissa Jackson*, Assistant United States Attorneys, were on the brief, for appellee.

*Samia Fam* and *Alice Wang* were on the brief for *amicus curiae* Public Defender Service.

Before EASTERLY and MCLEESE, *Associate Judges*, and WASHINGTON, *Senior Judge*.

MCLEESE, *Associate Judge*: Appellant Darrise Jeffers appeals from the trial

court's order detaining Mr. Jeffers pending trial pursuant to D.C. Code § 23-1325

(2012 Repl.). After briefing and oral argument, the court issued an emergency order remanding the case for further proceedings. We now publish this opinion to explain our ruling more fully.

## I.

In December 2018, Mr. Jeffers was charged with first-degree murder while armed. After a detention hearing in January 2019, the trial court ordered Mr. Jeffers held without bond pending trial, pursuant to D.C. Code § 23-1325(a) (2012 Repl.).

In summary, the evidence at the detention hearing as to the charged offense was as follows. At about 8 p.m. on July 16, 2018, several people were shot in an area known as Clay Terrace. One of them, a ten-year-old child, died as a result. Four people fired shots at the scene. Shell casings recovered from the scene indicated that at least four different weapons were fired, including a nine-millimeter weapon, a .45-caliber weapon, and a 5.56-millimeter rifle. The shooters, several of whom wore gloves, arrived at the scene in a black Infiniti. The Infiniti, which had previously been stolen in an armed carjacking, was found the next morning in Maryland. Ballistics and other evidence tied the Infiniti to the shooting and to various members of a "crew" known as Wellington Park. Wellington Park was in a

dispute with another group known as Clay Terrace. The feud may have stemmed from a prior incident in October 2017 in which a member of Wellington Park was shot.

Mr. Jeffers was a member of Wellington Park. About a week before the shooting, he exchanged text messages with Marquell Cobbs, another member of Wellington Park. The text messages indicated that Mr. Jeffers had a pistol that could have been a nine-millimeter. The same day, Mr. Cobbs communicated about guns with Qujuan Thomas, another member of Wellington Park.

On the day of the shooting, Quentin Michals, another Wellington Park member, communicated with Mr. Thomas and Gregory Taylor (yet another member of Wellington Park) about obtaining firearms and recruiting other members of Wellington Park to participate in a planned shooting. About a half-hour before the shooting, a security camera filmed Mr. Jeffers, Mr. Michals, and others walking out of 2508 Pomeroy Road SE at various points. Mr. Jeffers lived at 2506 Pomeroy. The black Infiniti that was later involved in the shooting was parked outside of 2508 Pomeroy, as was a silver BMW. Mr. Jeffers remained outside 2508 Pomeroy, at times speaking with Mr. Cobbs and two others. Several people, some wearing hoodies and/or gloves, got into the two cars. It was a very hot day, with a high

temperature of 95 degrees. After speaking to one of the passengers in the BMW, Mr. Jeffers went back into 2508 Pomeroy, returned with a pair of sneakers, and handed the sneakers to one of the passengers.

Both cars then drove off at about 7:35 p.m. Shortly thereafter, the silver BMW returned, driven by Mr. Michals. As previously noted, the shooting occurred at approximately 8 p.m. In the following twenty minutes, other members of Wellington Park returned on foot to the area outside 2508 Pomeroy. Mr. Jeffers was sitting outside 2508 Pomeroy during this period, at times talking with others including Mr. Michals. A couple of hours later, Mr. Jeffers and others allegedly involved in the shooting were outside of 2508 Pomeroy, dancing, singing, and displaying cash.

Finally, the day after the shooting, Mr. Jeffers and Mr. Michals exchanged messages about the location of various firearms, possibly including a nine-millimeter handgun and a firearm with a 100-round drum barrel that other evidence indicated may have been used in the shooting.

Based on this evidence, the trial court found that there was a substantial probability that Mr. Jeffers was guilty of first-degree murder as an aider and abettor.

That finding gave rise to a rebuttable presumption that no conditions of release could reasonably assure the safety of the community. D.C. Code § 23-1325(a). Concluding that Mr. Jeffers failed to rebut that presumption, the trial court ordered Mr. Jeffers held without bail until trial, which the trial court subsequently set for August 2020.

## II.

Section 23-1325 authorizes pretrial detention of defendants charged with certain particularly serious crimes, including first-degree murder, upon a showing of (1) probable cause to believe that the defendant committed the offense and (2) clear and convincing evidence that no conditions of release will reasonably assure the safety of the community. *Pope v. United States*, 739 A.2d 819, 825, 827 (D.C. 1999). If the court finds a substantial probability that the defendant committed the offense, there is a rebuttable presumption that no conditions of release will reasonably assure the safety of the community. D.C. Code § 23-1325(a).

We first address the meaning of the phrase "substantial probability" in § 23-1325(a). Each of the terms in that phrase can have a range of meanings. "On the one hand, 'substantial' means 'not seeming or imaginary'; on the other, it means

'that specified to a large degree.'" *Victor v. Nebraska*, 511 U.S. 1, 19 (1994)

(quoting *Webster's Third New International Dictionary* 2280 (1981)).  Similarly,

> [t]o a statistician, the term "probability" means simply how likely something is, and can vary anywhere from zero (meaning, in truth, no probability at all, or impossibility) to one (meaning certainty).  This is also the usage in common speech, where we may speak of a "small" probability (meaning much less than half), a "pretty good," "reasonable," or "fair" probability (meaning something in the middle range, perhaps a little more or less than one-half), or a "strong," "overwhelming," or "very great" probability (meaning something that will happen most of the time, well over half).
>
> The other usage, derived from the definition of probability as "the state of being probable," implies that rather than a continuum of states there are only two:  a probability or not a probability.  This is the 50+% test.

*Bell v. United States*, 854 F.2d 881, 889 (6th Cir. 1988).

Depending on the meaning given to its components, the phrase "substantial

probability" can mean anything from "a not-insignificant chance" to "very likely."

*See, e.g.*, *Ingram v. United States*, 592 A.2d 992, 1002 (D.C. 1991) (describing 20%

chance as substantial probability); *I-CA Enters. v. Palram Ams., Inc.*, 185 Cal. Rptr.

3d 24, 45 (Ct. App. 2015) (in context of claim at issue, "substantial probability"

"means that it is very likely that the plaintiff will prevail on such a claim or there is

a strong likelihood that the plaintiff will prevail on such a claim") (internal quotation

marks omitted).  Interpreting the phrase thus requires consideration of context.  *See,*

*e.g.*, *Coll. Hosp., Inc. v. Superior Court*, 882 P.2d 894, 900 (Cal. 1994) ("The phrase 'substantial probability,' standing alone, is particularly ambiguous. These and similar words are widely used in California law under circumstances which indicate that their meaning depends entirely upon the particular context.").

Our prior cases provide some guidance as to how to understand "substantial probability" in the context of pretrial detention. D.C. Code § 23-1322 (2012 Repl.) permits temporally limited pretrial detention of defendants in certain circumstances. Interpreting a since-amended version of § 23-1322, we held that "[a] 'substantial probability' is a degree of proof meaningfully higher than probable cause, intended in the pretrial detention statute to be equivalent to the standard required to secure a civil injunction—likelihood of success on the merits." *Blackson v. United States*, 897 A.2d 187, 196 n.16 (D.C. 2006) (interpreting D.C. Code § 23-1322 (2001 & 2005 Supp.)) (internal quotation marks omitted); *United States v. Edwards*, 430 A.2d 1321, 1339 (D.C. 1981) (en banc). We also "have cautioned against equating 'substantial probability' with the 'clear and convincing evidence' standard." *Blackson*, 897 A.2d at 196 n.16. Finally, we have explained that the substantial-probability standard requires "an informed estimate of whether the government will prove the charge at trial." *Edwards*, 430 A.2d at 1338 n.42.

The phrase "substantial probability" was introduced into § 23-1325 in 1989. Law Enforcement Amendment Act of 1989, D.C. Law 8-120, § 2(b), 37 D.C. Reg. 24, 25 (Jan. 5, 1990). Neither the parties nor our cases suggest any reason for interpreting the phrase differently in § 23-1325 than in § 23-1322. *See generally, e.g.*, *Smith v. United States*, 597 A.2d 377, 382 n.11 (D.C. 1991) ("Ordinarily, Congress may be presumed to know the construction which has been given to prior statutory provisions, and to know their history, when it incorporates them into later legislation. The same reasoning applies to the Council of the District of Columbia.") (citation and internal quotation marks omitted); *Merrill v. Fahs*, 324 U.S. 308, 313 (1945) ("But to interpret the same phrases in the two [laws] concerning the same subject matter in different ways where obvious reasons do not compel divergent treatment is to introduce another and needless complexity . . . ."). We therefore treat our cases interpreting "substantial probability" under § 23-1322 as fully applicable to § 23-1325.

Tying the substantial-probability standard to "likelihood of success on the merits" creates a complication. In this court, as used in the context of requests for preliminary injunctions, "likelihood of success on the merits" "does not express a fixed measurement, as it is part of a multi-factor test where a stronger showing on some factors can compensate for a weaker showing on others." *Competitive Enter.*

*Inst. v. Mann*, 150 A.3d 1213, 1234 (D.C. 2016; amended 2018) (footnote omitted); *cf., e.g.*, *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011) (noting conflict among federal courts of appeals as to whether sliding-scale approach to "likelihood of success on the merits" remains permissible after *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)). It is not clear how the "sliding scale" approach applicable to requests for preliminary injunctions would operate if imported into the pretrial-detention statutes. Perhaps for that reason, the parties in this case do not advocate the use of a sliding-scale approach in the current context, rather each advocating a different fixed measurement of "substantial probability." We also do not understand the Public Defender Service as *amicus curiae* to advocate a sliding-scale approach. We agree with and therefore accept this consensus.

We turn to the question of what fixed measurement of "substantial probability" is appropriate for purposes of § 23-1325. We hold that to establish a substantial probability the United States must show at a minimum that it is more likely than not that the defendant would be found guilty beyond a reasonable doubt at trial of an offense permitting detention under § 23-1325. We so hold for two reasons. First, the phrase "likelihood of success on the merits" naturally directs the inquiry to the chances of conviction at trial. *Edwards*, 430 A.2d at 1338 n.42 (substantial-probability standard requires "an informed estimate of whether the

government will prove the charge at trial"). Assessing the likelihood of success at trial, moreover, requires consideration of the burden of proof applicable at trial. *See, e.g.*, *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009) (when ruling on request for preliminary injunction in patent case in which movant would bear burden to prove patent invalidity by clear and convincing evidence at trial, trial court "must determine whether it is more likely than not that the [movant] will be able to prove at trial, by clear and convincing evidence, that the patent is invalid"); *cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.").

Second, we have previously given great weight to the legislative history of the enactment of § 23-1322 in interpreting the phrase "substantial probability." *Edwards*, 430 A.2d at 1334, 1339. The House Report on the bill including what became § 23-1322 explained that the substantial-probability standard was chosen "to minimize so far as practicable the possibility of detaining defendants prior to trial who are innocent of the charge lodged against them." H.R. Rep. No. 91-907, at 182 (1970). It would be inconsistent with that purpose to interpret the substantial-probability standard to give rise to a presumption of detention in cases in which the

trial court concludes that the defendant was more likely to be acquitted than to be convicted.

Mr. Jeffers and the Public Defender Service argue that the substantial-probability standard should be interpreted to require not merely a showing that the United States is more likely than not to prevail at trial, but rather a showing of "strong likelihood" or "reasonable certainty" of success at trial. We need not decide that issue, and we express no view on it. For purposes of deciding the present case, it suffices to hold, as we do, that the substantial-probability standard requires at a minimum that the trial court find it more likely than not that the defendant would be found guilty beyond a reasonable doubt at trial of an offense permitting detention under § 23-1325. That holding suffices to decide this case because we conclude that the record does not reasonably support such a conclusion.

There is no direct evidence that Mr. Jeffers was aware of the intended shooting before it occurred, much less that he intended that the shooting occur. There is also no direct evidence that Mr. Jeffers took an act that aided and abetted the shooting or was intended to do so. The United States argues that the circumstances taken as a whole permit reasonable inferences that Mr. Jeffers was aware of the shooting ahead of time; that he intended to assist with the shooting; and that he participated in the

planning of and preparations for the shooting, by among other things being involved in a conversation about guns before the shooting, speaking with the shooters before the shooting, and bringing sneakers to one of the passengers in the BMW. As the United States acknowledges, Mr. Jeffers's conduct after the shooting cannot be considered the actus reus of an aiding-and-abetting offense, but may be considered as shedding light on Mr. Jeffers's mental state before the shooting. *See, e.g.*, *Martin v. United States*, 606 A.2d 120, 133 (D.C. 1991) ("[T]he jury may consider [the alleged aider and abettor's] subsequent conduct to the extent, if any, that it sheds light on his state of mind prior to the shooting."). One can debate the strength of the inferences urged by the United States, but we conclude that those inferences are not sufficiently strong to support a reasonable conclusion that the United States is more likely than not to persuade a factfinder at trial that Mr. Jeffers is guilty beyond a reasonable doubt of aiding and abetting first-degree premeditated murder.

For the foregoing reasons, the prior emergency order of this court reversed the order of the Superior Court and remanded the case for further proceedings.