NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0521n.06

Case No. 23-5547

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Dec 13, 2024

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| DEBRA CHESNUT, GLENN CHESNUT, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| UNITED STATES OF AMERICA, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | OPINION |

Before: BATCHELDER, STRANCH, and READLER, Circuit Judges.

CHAD A. READLER, Circuit Judge. This medical malpractice case asks whether Debra Chesnut had a particular vascular condition (ischemia) before a specific date (April 13, 2016). The district court found that she did not. Because that conclusion is not clearly erroneous, we affirm.

**I.**

In 2016, Debra Chesnut developed sharp pains in her legs, prompting her to seek medical attention over the course of two weeks in early April. Chesnut's right leg was diagnosed as suffering from sciatica, a muscular condition in which pain travels along the sciatic nerve. By the time Dr. Jared Madden treated her on April 12, Chesnut's symptoms included pain in her legs, numbness below the waist, and a cold feeling in her right leg.

The next day, Chesnut developed three new symptoms. Her right leg had no pulses. Her right foot turned blue. And it showed clear signs of paralysis. Shaken by the color of her foot,

Chesnut called Madden, who instructed her to go to the emergency room.  A doctor there diagnosed Chesnut with an ischemic right foot, a vascular condition tied to insufficient blood supply. Chesnut's treater arranged for her to be transported to see Dr. Eric Endean, a vascular surgeon. Over the next several days, Endean and others employed various treatments to save Chesnut's leg. Regrettably, none proved successful.  Lacking other treatments, Endean amputated Chesnut's leg below the knee.

Chesnut (along with her husband) sued Madden under the Federal Tort Claims Act, alleging medical negligence and loss of consortium.  Chesnut asserted that Madden, a physician at a federally funded facility, misdiagnosed Chesnut on April 12.  Had Madden properly diagnosed Chesnut with ischemia at the time he treated her, she claimed, he could have saved her leg from amputation.  The district court substituted the United States as the sole defendant for the claims, and the parties agreed to submit the case for judgment on the briefs.  The district court thereafter issued two opinions, each of which shapes today's appeal.

In its first opinion, the district court concluded that Madden was negligent in his treatment of Chesnut.  *Chesnut v. United States*, No. 17-cv-00079, 2020 WL 8187479, at *7 (E.D. Ky. Oct. 8, 2020).  By failing to conduct a thorough vascular examination of Chesnut on April 12, the court explained, Madden did not consider the possibility that Chesnut had a vascular condition, like ischemia, breaching his standard of care, as set by Kentucky law.  *Id.* at *6–7.  In resolving the related question—whether Madden's negligence proximately caused Chesnut's injury—the district court misapplied its negligence finding.  It did not ask (as it should have) whether Madden's failure to consider the possibility that Chesnut had ischemia on April 12 proximately caused her injury.  Instead, the district court, assuming that Chesnut had ischemia on April 12, asked whether her injury would have occurred if "Madden had properly diagnosed the condition on the afternoon

2

of April 12 when it was properly diagnosed the next day[.]" *Id.* at *7. The district court answered that question in the negative and ruled for the government. *Id.* at *11.

On appeal, we reversed and remanded. At issue was the district court's proximate cause analysis. The district court had defined Madden's negligence as the failure to consider whether Chesnut suffered from a vascular disease, yet proceeded to define negligence differently in its proximate cause analysis. *Id.* at *6–7. In keeping with the district court's original negligence finding, the "proper causation inquiry [wa]s whether Dr. Madden's failure to consider the possibility of ischemia [on April 12] caused [Chesnut]'s amputation." *Chesnut v. United States*, 15 F.4th 436, 444 (6th Cir. 2021). We thus directed the district court to take "another opportunity" to determine whether "Madden's negligence"—that is, his failure to consider "the possibility of vascular causes as the source of [Chesnut's] symptoms in his diagnosis on April 12"—proximately caused Chesnut's amputation. *Id.* at 444, 452.

On remand, the district court did so. Critical to its inquiry was whether Chesnut had ischemia before April 13. *Chesnut v. United States*, No. 17-cv-00079, 2023 WL 3992128, at *2 (E.D. Ky. May 25, 2023). If, as the government asserted, Chesnut's ischemia presented first on April 13, Madden's failure to consider the possibility of vascular disease did not proximately cause her injury. The district court agreed that Chesnut had not shown that she had ischemia before April 13, and granted judgment for the government. *Id.* at *8. Chesnut timely appealed.

**II.**

Chesnut contests the district court's conclusion that Madden's negligence did not proximately cause her injury. Specifically, Chesnut believes that the district court committed reversible error when it found that she did not have ischemia on April 12. Because her challenge turns on a question of fact, we review for clear error. *See Bell v. United States*, 854 F.2d 881, 885–

3

86 (6th Cir. 1988); *Hasler v. United States*, 718 F.2d 202, 204 (6th Cir. 1983). Under that highly deferential standard, we may reverse the district court only if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Chesnut believes her ischemia developed on April 4, progressed through April 12 (the day Madden treated her), and peaked on April 13. The government, on the other hand, contends that Chesnut suffered a sudden ischemic event sometime during the morning of April 13. Before engaging further, some background on ischemia is in order. According to expert testimony in the district court, acute limb ischemia results from a sudden cessation of blood supply and nutrients to the active tissues of the limb. Clinical events that cause acute limb ischemia include thrombosis of a limb artery or an embolism of a diseased artery. A thrombosis is a blood clot that develops within the lining of a vessel, and an embolus refers to a blood clot that travels through the limb. Once an ischemic event occurs, symptoms and signs develop over a period of hours to days. They are often grouped into a mnemonic, together known as the six Ps of ischemia: (1) pain, (2) paresthesia (numbness); (3) poikilothermia (cold limb); (4) pallor (discoloration); (5) pulselessness, and (6) paralysis.

With this medical backdrop in mind, we see no basis to disturb the district court's decision. In resolving whether Chesnut had ischemia on April 12, the day Madden treated her, the district court asked two questions. First, what symptoms did Chesnut have on April 12? *Chesnut*, 2023 WL 3992128, at *3–4. Said differently, which of the six Ps of ischemia, if any, did Chesnut exhibit the day Madden treated her? Only three, thought the district court: pain, paresthesia (numbness); and slight poikilothermia (cold limb). *Id.* at *4. The district court did not commit clear error in concluding that Chesnut lacked the other three Ps. As for pulselessness, all three medical

4

professionals who treated Chesnut before April 13, including Madden, determined that Chesnut had pulses in her legs. As for paralysis, Madden performed a "drop foot" test on Chesnut; because she could raise her right foot, Chesnut showed no signs of paralysis. Finally, as for pallor, two of Chesnut's treaters testified that, as of April 12, her legs showed no signs of discoloration. All in all, we find no clear error in the district court's finding that Chesnut had only three Ps of ischemia on the day Madden treated her. *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

Turn to the district court's second question: did Chesnut's three symptoms and signs on April 12 establish, by a reasonable degree of medical probability, that she then had ischemia? *Chesnut*, 2023 WL 3992128, at *4. After reviewing the record, the district court answered in the negative. *Id.* at *4–8. At least four considerations illustrate why that conclusion was not clearly erroneous.

One, Chesnut's pain, paresthesia (numbness), and slight poikilothermia (cold limb) on April 12 correlated with countless medical conditions, including sciatica. And not only are pain and paresthesia (numbness) subjective feelings, but they are also some of the most common symptoms reported by patients. Based on these symptoms, one witness explained, all three providers who treated Chesnut before April 13 diagnosed her with sciatica.

Two, the presence of pulses in Chesnut's leg on April 12 provided evidence that she did not have ischemia at the time. As one witness testified, "[t]he word 'ischemia' means lack of blood flow to a specific organ or tissue, and palpable pulses means that you have excellent blood flow to that particular area." R. 271, PageID 7226–27. Because there was evidence in the record

that Chesnut had pulses when Madden treated her, it was not clear error for the district court to conclude that she likely also had blood flow in her legs.

Three, multiple witnesses explained that, if Chesnut actually started embolizing on April 4, she would have demonstrated clear signs of ischemia by April 12. Once an ischemic event happens, the six Ps manifest rapidly, over a period of hours to days. So, according to these experts, if Chesnut had suffered an ischemic event on April 4, she would likely have developed objective indicators of ischemia by the time Madden treated her.

Four, and most notably, Chesnut's symptoms were fundamentally different the next day, April 13. At that point, Chesnut had all of the objective indicators of ischemia, including pallor (discoloration), paralysis, and pulselessness. The rapid onset of these symptoms and signs, the district court reasoned, was consistent with the government's theory that Chesnut suffered a sudden ischemic event sometime during the morning of April 13. *Id.* at *6, 8. In short, the district court's conclusion that Chesnut did not have ischemia on April 12 was not clearly erroneous.

## III.

Chesnut resists this conclusion on several fronts. We take them in turn.

A. To begin, Chesnut argues that the district court failed to follow this Court's mandate on remand. Not so. Beginning with the basics, the mandate rule binds a district court to the scope of the remand we issue. *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). With a limited remand, the district court may address only the issue(s) we identify therein. *See Monroe v. FTS USA, LLC*, 17 F.4th 664, 669 (6th Cir. 2021). Here, our remand was limited to an instruction to the district court to decide whether Madden's negligence—his failure to consider the possibility of vascular disease on April 12—proximately caused Chesnut's injury. *Chesnut*, 15 F.4th at 444.

Chesnut contends that the district court disobeyed this charge by reconsidering its finding in its initial decision that Chesnut had ischemia before April 13. Chesnut misconstrues the earlier opinion. There, the district court framed the causation question by asking whether Madden's failure to diagnose Chesnut with ischemia on April 12 proximately caused her injury. *Chesnut*, 2020 WL 8187479, at *7. In so doing, the district court simply presumed that, on the day Madden treated her, Chesnut had ischemia. *See id.* at *7–8. Our limited remand directed the district court to reconsider the causation question by asking whether Madden's failure to consider the possibility of vascular disease on April 12 proximately caused Chesnut's injury. *Chesnut*, 15 F.4th at 444, 452 (providing the district court "another opportunity" to "consider whether Dr. Madden's negligence"—that is, his failure to consider "the possibility of vascular causes as the source of [Chesnut's] symptoms in his diagnosis on April 12"—proximately caused Chesnut's "below-the-knee amputation"). To do so, the district court was required to determine whether Chesnut likely had ischemia on April 12. In short, the district court resolved the very issue we told it to resolve.

B. Next, Chesnut argues that the district court erred by failing to consider three pieces of evidence. Each deserves its turn.

Start with the computer tomography angiography (CTA) taken on April 13. The CTA revealed that Chesnut had multiple blood clots in her right leg. This evidence, Chesnut believes, "[i]s conclusive proof that [she] had ischemia when she saw Dr. Madden" on April 12. Appellants Reply Br. 6. But she does not explain why this is so. And she does not offer evidence to corroborate her view.

Nor does Chesnut overcome the clear-error hurdle by arguing that her CTA results are inconsistent with the government witnesses' use of the term "embolus." These witnesses testified that Chesnut suffered a major embolic event on April 13, triggering her ischemia. As Chesnut

notes, two of the government's expert witnesses, Dr. Thomas Naslund and Dr. Michael Dudkiewicz, described this major embolic event as an "embolus," a singular term that could refer to one blood clot. *See, e.g.*, R. 238, Naslund Dep., PageID 3728 (opining that Chesnut had "an embolus"); R. 271, Dudkiewicz Dep., PageID 7252 (attributing Chesnut's ischemia to "a major embolus that occurred on the 13th which occluded a major, large vessel"). Chesnut argues that Naslund and Dudkiewicz's "theory of a single embolus" is "dispelled" by the fact that she had "multiple blood clots" on April 13, as her CTA revealed. Appellant Br. 20. We see a few problems with this argument.

First and foremost, the argument does nothing to help Chesnut demonstrate that she had ischemia on April 12. As we explained above, the district court credited the government's theory that Chesnut suffered a sudden ischemic event on April 13. In reaching its conclusion, the district court primarily relied on the fact that Chesnut had none of the objective indicators of ischemia on April 12. Chesnut's argument here only begs the question: Why could multiple blood clots not have developed on April 13 and caused Chesnut's sudden onset of ischemia? Chesnut never provides us with an answer to this question.

Second, we are not confident that the government's witnesses, by sometimes using the term "embolus," necessarily rejected the fact that Chesnut had multiple blood clots on April 13. For example, Dudkiewicz clearly testified that on April 13, Chesnut had a "thrombus" (i.e., a blood clot) in her "iliacs and her femorals" and the medical records confirm that she indeed had blood clots in those parts of the body on April 13. R. 271, PageID 7295; R. 259, PageID 5220–25. That suggests that Dudkiewicz appreciated Chesnut had multiple blood clots on April 13. Furthermore, Chesnut's own expert witness gave testimony that may make sense of the government witnesses' use of the singular "embolus." Dr. James Roberts, for example, acknowledged that Chesnut likely

8

"had some sort of *clot* that . . . broke off and started to shower." R. 233, PageID 3003 (emphasis added). He repeatedly testified that one "clot begets [another] clot." *See, e.g.*, R. 233, PageID 3007. All of this may make sense of the government witnesses' use of "embolus." Chesnut may have had an ischemic event (a major embolus) on April 13, and that embolus may have caused, or begotten, other blood clots. All in all, based on our review of the record, we cannot say that Chesnut's argument here helps her to overcome the clear-error hurdle.

Turn now to the testimony of a medical professional who testified for Chesnut: Dr. Endean, the vascular surgeon who amputated her leg. Endean testified that he believed, as of April 13, Chesnut had been suffering from ischemia for a "prolonged time." As Chesnut sees it, the district court committed clear error in disregarding this testimony, as it proves that she had ischemia before April 13. But the testimony was largely conclusory, and Endean never elaborated on the meaning of the term "prolonged." We therefore cannot say that the district court clearly erred in failing to address Endean's testimony.

That leaves Chesnut's smoking. She contends that her heavy smoking played a substantial role in the development of her ischemia. That may be true. Either way, it is beside the point. Whether smoking contributed to Chesnut's eventual onset of ischemia tells us nothing about when her ischemia presented.

C. Moving on, Chesnut argues that the district court clearly erred by focusing solely on the symptoms she experienced on April 12. Because ischemia can conclusively be proven only by technological imaging, Chesnut argues, the district court erred by using her symptoms alone to decide whether she suffered from ischemia. It may be that one cannot conclusively determine whether a patient has ischemia without imaging. But no imaging was taken on April 12, nor was an alternative methodology available to the district court. In the end, the district court's symptoms-

based analysis was reasonable, especially when the record supports the understandable reality that doctors routinely diagnose medical conditions, including ischemia, based on objective, physical evidence.

D.  Chesnut concludes by making a number of arguments that, at bottom, essentially ask us to revisit the district court's weighing of the evidence.  For example, Chesnut challenges the district court's finding that she had neither pallor (discoloration) nor paralysis on April 12.  But as we have already explained, the district court's conclusions on these fronts were "plausible" in light of the record.  *Anderson*, 470 U.S. at 574.  As for pallor, treating professionals testified that Chesnut's legs showed no signs of discoloration when they treated her before April 13.  And as Chesnut could raise her right leg on April 12, she seemingly was not suffering from paralysis then.

Equally unavailing is Chesnut's claim that the district court erred by failing to determine what precisely caused her April 12 symptoms.  That framing ignores the fact that, under Kentucky law, Chesnut bears the burden of proving that she had ischemia on that date.  *See Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982). In any event, ample evidence supports the district court's conclusion that Chesnut's pain, paresthesia (numbness), and slight poikilothermia (cold limb) could be explained by any number of medical conditions unrelated to ischemia, including sciatica.

Chesnut lastly contends that the district court improperly weighed the testimony of her expert witnesses, Dr. Samuel Kiehl and Dr. James Roberts.  Starting with Kiehl, he testified that Chesnut had ischemia on April 12 and that Madden probably could have saved her leg by treating her with a blood thinner known as heparin.  Perhaps so.  Yet that fact does not help Chesnut overcome the steep clear-error hurdle.  Again, a district court does not commit clear error by rejecting one permissible view of the evidence and crediting another. *Anderson*, 470 U.S. at 574.

Turning to Roberts, the district court did not commit clear error in declining to credit his testimony that Chesnut had ischemia on April 12. When asked why Madden should have sent Chesnut to the emergency room on April 12 for vascular treatment, Roberts responded: "[s]he[] had paresthesia[] after a negative CT scan," and "[s]he still ha[d] a lot of pain." R. 233, PageID 3067–68. But as already explained, other witnesses emphasized that Chesnut's pain and paresthesia (even with a negative CT scan) could be explained by any number of medical conditions, including sciatica. Those witnesses repeatedly stated that Chesnut's change in symptoms on April 13 indicated that she suffered a sudden ischemic event sometime after Madden treated her. At bottom, Chesnut asks us to rebalance the evidence, which we cannot do. We see no clear error in the district court's choice to credit the government's contrary theory.

* * * * *

We affirm the district court's judgment.

11